OPINION of the court
Jeffry H. Gallet, J.
These 33 nonpayment and two holdover proceedings were tried jointly. The respondents tenants defended the nonpayment proceedings on the grounds that the petitioner landlord had breached the implied warranty of habitability, and they counterclaimed for damages for breach of contract and punitive damages. The two holdover proceedings were withdrawn or dismissed during trail. The remaining 20 cases are decided here.
FACTS
The apartment building 111 East 88th Street is located on Manhattan’s upper east side, one of New York City’s most fashionable neighborhoods. It was purchased by the present *694 landlord, a limited partnership, in November of 1979. Shortly after purchase, the landlord presented a co-operative offering plan proposing a sale of the building to its tenants, including the respondents.
The respondents contend that shortly after the petitioner acquired the building it caused the building’s services to deteriorate. Without repeating the testimony of the 34 witnesses who testified over 17 trial days or the several hundred pages of exhibits, it is sufficient to say that this court is convinced that there was indeed a pattern of withholding of service.
Petitioner’s assertion that there was no reduction in services is refuted by the admission that it discharged both the full-time superintendent and the full-time handyman and replaced them with people whose primary work was elsewhere and who were not at the building at scheduled days and times. The evidence overwhelmingly establishes that since November of 1979, there was no heat for all or part of at least 43 days (28% of the period during which heat is customarily supplied), no hot water for at least 53 days and no passenger elevator service for part of at least 38 days. During February of 1980, there were only 4 days when heat, hot water and elevator service were available for the entire day. Additionally, cleaning and routine maintenance were inadequate, the lobby furniture was removed, the front door lock (the first defense against intruders) remained broken after notice of disrepair and garbage collection and disposal were irregular. The court finds the direct testimony of petitioner’s two general partners, Robert Ernstoff and Arnold Rosenshein, that the building services were up to standard, to be without credibility and to a great extent contradicted by their own testimony on cross-examination.
ABATEMENT
It is well recognized that leases are contracts rather than simply conveyances of an interest in realty. (Park West Mgt. Corp. v Mitchell, 47 NY2d 316, cert den 444 US 992; Javins v First Nat. Realty Corp., 428 F2d 1071, cert den 400 US 925; 57 E. 54 Realty Corp. v Gay Nineties Realty Corp., 71 Misc 2d 353; Houston Realty Corp. v Castro 94 Misc 2d 115; Real Property Law, § 235-b.)
*695 As part of that contract, subdivision 1 of section 235-b of the Real Property Law requires the court to read into every residential lease contract a clause guaranteeing that the premises will be free of conditions dangerous to the health and safety of the tenant and that they will be fit for the uses reasonably intended. On the basis of the facts as presented here, the court finds that the implied warranty of habitability has been breached.
With respect to the amount of rent abatement to be allowed as a result of the breach of the warranty, the court must address the vexing question of assessing damages. In Park West Mgt. Corp v Mitchell (supra), the Court of Appeals, recognizing that damages in warranty cases are not susceptible to precise determination, applied a reduced value test, holding that damages could be measured by the difference between the fair market value of the premises as warranted and the reduced value as a result of the breach. The court may grant an abatement for the months before the tenants began withholding their rent. (N. Town Roosevelt Assoc. v Muller, NYLJ, Oct. 27,1980, p 6, col 4), as well as for breach of contract. (Goodman v Ramirez, 100 Misc 2d 881.) The Court of Appeals left to the trial courts the latitude to fashion remedies other than the diminution of value approach it used. (Park West Mgt. Corp. v Mitchell, supra.)
The lease rental is competent evidence of the apartment’s value as warranted, and in the absence of other evidence is controlling. (Reichick v Matteo, NYLJ, Jan. 23,1980, p 13, col 2.) The difficulty is in determining the reduced value. However, that their damages are not susceptible to precise determination, should not bar the tenants’ recovery. (Park West Mgt. Corp. v Mitchell, supra, p 418; Sargent Realty Corp. v Vizzini, 101 Misc 2d 763.)
To assist it in calculating damages, the court has the uncontradicted expert testimony of an officer of a major real estate firm who is an experienced real estate appraiser. Reviewing the testimony and exhibits, the court finds appalling conditions and a diminution in the rental value of the apartments in question by 50% for the months of December of 1979 and January and February of 1980, and 25% for the months of November of 1979 and March through *696 November of 1980. (Ocean Rock Assoc. v Cruz, 66 AD2d 878, app dsmd 46 NY2d 998.)
In addition to their damages resulting from the breach of the warranty of habitability, the tenants have sustained additional damages from the landlord’s breach of the lease contract. Given that the modern apartment lease is a contract for services, one of the elements of that contract is to be able to reasonably rely on them. Where the services provided by the landlord are so erratic as to prevent reliance, this inability to rely on the landlord’s provision of services constitutes a breach of contract forming an independent basis for the calculation of damages beyond the diminution of rental value for the days without service. If essential services are not predictable, there is a reduction of rental value even on days when they are supplied.
As several tenants testified, they had to alter their schedules as a result of the sporadic supply of services. Showers were taken when there was hot water, rather than at convenient times. Even then, every shower was an adventure, with the water temperature changing during the shower. Guests could not be invited with certainty that they could be normally entertained. The court therefore abates each tenant’s rent by an additional 5 % for the months of December of 1979 and January and February of 1980, and by an additional 2 % for November of 1979 and March through November of 1980.
An abatement for the month of December of 1980 was not considered by the court.
PUNITIVE DAMAGES
This court has generally eschewed an award of punitive damages. However, there appears to be no other adequate remedy in this case. Although automobile owners are required to be licensed for the protection of the public’s health and safety before they may operate their vehicles, tenants have no similar protection from building owners who may endanger their health and safety.
This court is shocked by the wanton disregard of the health and safety of these tenants by this landlord. Such behavior must be discouraged. (Kipsborough Realty Corp. *697 v Goldbetter, 81 Misc 2d 1054 ;15 & 19 West 55th St. Realty Co. v Mazzola, NYLJ, Oct. 26, 1977, p 11, col 2.) Under these, facts, punitive damages is an appropriate remedy. (Stern v Hotel Carter, NYLJ, Feb. 26, 1980, p 6, col 2; Davis v Williams, 92 Misc 2d 1051; New York City Civil Court Act, § 110, subd [c].) To deny punitive damages in an appropriate case would encourage serious violations of the warranty of habitability by assuring landlords-that the worst consequence of such violations would be an abatement of rent which would merely reduce the lease rent to the proper rental value for the level of services actually provided. (Century Apts. v Yalkowsky, Civil Ct of City of New York, Index No. L & T 57575/80.)
To understand the application of punitive damages, we must look at their origin. The law of punitive damages can be traced to the Code of Hammurabi (Law 8) and the Bible (Exodus 121, 37). The principal case to which the common law of punitive damages can be traced is Huckle v Money (2 Wils 205, 95 Eng Rep 768 [KB 1763]). In that case, an award of “exemplary damages” was made, although the injury was minor, because of the defendant’s outrageous behavior. It has long been the law of this State that punitive damages may be awarded not only to recompense the person injured, but also to punish a wrongdoer. (Taylor v Church, 8 NY 452; Millard v Brown, 35 NY 297; Hamilton v Third Ave. R. R. Co., 53 NY 25.) They are also intended to solace the plaintiff for mental anguish, laceration of his feelings, shame, degradation, or other aggravations of the original wrong (Goines v Pennsylvania R. R. Co., 208 Misc 103). And they are an inducement to the plaintiff to take action against the wrongdoer, thereby providing a service to the public by preventing further harm to others. (Walker v Sheldon, 10 NY2d 401.) It is not the form of the action which gives the court the right to award punitive damages, but rather the moral culpability of the defendant. (Hamilton v Third Ave. R. R. Co., supra.)
In awarding punitive damages, the court must base the size of the award on the financial condition of the wrongdoer, rather than just the damages suffered by the victim. Because punitive damages are based on the moral culpability of the offending party, and are intended to discourage *698 future wrongdoing, they must be sufficiently large to have a punitive impact on the wrongdoer. An award based only on the victim’s financial position or the damages suffered, might constitute a mere slap on the wrist of the wrongdoer and would not accomplish the public purpose of discouraging repetition of the wrong. Punitive damages appropriate to the landlord’s financial position appears to be one of the remedies or “sanctions” authorized by subdivision (c) of section 110 of the New York City Civil Court Act. (Davis v Williams, 92 Misc 2d 1051, supra.)
Even without other evidence, the pattern of lack of and inadequate essential services alone, in this case, would be a sufficient basis for the award of punitive damages. But the record discloses much more. The tenants’ professional engineer Richard Balser, and one of the landlord’s partners, Arnold Rosenshein, testified that six “lugs” or “pins” were inserted in the building’s heat timer device. Rosenshein, Balser and New York City Housing Inspector James O’Brien testified that the lugs were capable of shutting down the heating system during cold weather, a clear violation of section D26-17.03 of the Administrative Code of the City of New York. Such a violation has already been held, by itself, to be grounds for a punitive damages award. (15 & 19 West 55th St. Realty Co. v Mazzola, NYLJ, Oct. 26,1977, p 11, col 2, supra.)
Distressingly, there is still more.. The service staff was intentionally reduced and the front door was not repaired (allowing unauthorized access into the building for long periods of time).
The record discloses a clear pattern of malevolent withholding of services. Based on the landlord’s substantial financial position as sponsor of a multimillion dollar co-op plan, this court awards punitive damages of $25,000 for the 13 months in question, to be allocated among the respondent tenants in proportion to their rents.
LEGAL FEES
The landlord has sued for legal fees in certain of these proceedings, and the tenants have counterclaimed for legal fees pursuant to section 234 of the Real Property Law. *699 The reasonable value of the legal services rendered is not in dispute.
This court looks with disfavor on the award of legal fees to the prevailing side in a lawsuit because such awards adumbrate a penalty for losing a lawsuit which would place a price on the right to “a day in court”. However, the court is bound by the opinion of the Appellate Term, First Department, in N. V. Madison, Inc. v Saurwein (103 Misc 2d 996) which upheld such awards.
Accordingly, the court awards $9,500 in legal fees to those respondents who were sued for legal fees to be divided among them per capita.
DECISION
Judgment for the petitioner in each case for the rents for the months of January through December of 1980, less a sum equal to 55% of the rents due for December, 1979 and January and February of 1980, 27 % of the rents due for November of 1979 and March through November of 1980, each tenant’s proportionate share of the $25,000 punitive damages award, and where eligible, of the per capita share of legal fees of $9,500.